UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ALLIED WORLD SPECIALTY INSURANCE
COMPANY, f/k/a DARWIN NATIONAL
ASSURANCE COMPANY,                                                    **COMPLAINT**

                        Plaintiff,                                           Docket No.: 16 Civ. 7096

    - against -

COUNTY OF PUTNAM, NEW YORK,

                        Defendant.
-------------------------------------------------------------X

       The plaintiff, **ALLIED WORLD SPECIALTY INSURANCE COMPANY** ("Allied World"), f/k/a Darwin National Assurance Company, as and for its Complaint against the defendant, the County of Putnam, New York ("the County"), alleges as follows:

### PARTIES

       1.     Allied World is a corporation organized and existing pursuant to the laws of the State of Delaware, with its principal place of business at 30 South 17th Street, Philadelphia, Pennsylvania.

       2.     Upon information and belief, the County is a public corporation existing by virtue of the laws of the State of New York.

### JURISDICTION AND VENUE

       3.     Jurisdiction over this matter lies with this Court pursuant to 28 U.S.C. § 1332, as this matter involves citizens of different States and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

       4.     Venue in this District is proper, as a substantial part of the events or omissions giving rise to the claim that is the subject of this Complaint occurred in this District.

**CAUSE OF ACTION**

5. On or about March 10, 2014, the County entered into a contract with Burtis Construction Co., Inc. ("Burtis"), pursuant to which Burtis was to perform certain construction work in furtherance of a project known as "Putnam Bikeway II Stage 4" in the Town of Southeast, New York (the construction contract is hereinafter referred to as "the Contract", and the construction project is hereinafter referred to as "the Project").

6. The Project involves the construction of a three-meter wide, nearly one-mile long shared use, paved path.

7. The original price that the County was to pay Burtis for the construction work pursuant to the Contract was $5,364,062.44.

8. On or about March 10, 2014, at the specific request of Burtis, Allied World, as surety, executed a Performance Bond on behalf of Burtis, as principal, in favor of the County, as obligee, in the penal sum of $5,386,685.36, in connection with the Project.

9. The Performance Bond obligates Allied World to remedy a failure by Burtis to "well and faithfully perform" the Contract, and to indemnify the County for "all outlay and expense" that the County incurs in remediating a default by Burtis, subject to the Performance Bond's terms and conditions.

10. By letter dated November 10, 2015, the County declared Burtis to be in default in the performance of its obligations under the Contract.

11. The County's default letter states that the default results from Burtis's "failure to progress [the Project] as agreed to/in accordance with the terms of the parties' Agreement . . . ."

12. This letter also suspended construction activity, on the ground that "no imminent construction activity to progress exists anywhere on the construction site . . . ."

13. By letter dated December 17, 2015, the County notified Allied World that it had declared Burtis to be in default and requested that Allied World contact the County "to discuss the necessary steps the County must take to enforce its rights under the terms of" the Performance Bond.

14. Upon information and belief, the County has not formally terminated the Contract (or Burtis's right to proceed thereunder) for cause.

15. Nevertheless, Allied World has considered the County's December 17 letter as asserting a claim against the Performance Bond.

16. By letter dated November 19, 2015, Burtis denied that it is in default, contended that the County's default of Burtis is "wrongful" and "constitutes a material breach of contract", and that it "ignores the numerous and substantial design errors and omissions" of the project's designer, HVEA Engineers ("HVEA"), "which have either delayed and/or prevented Burtis from progressing its Contract Work in a productive and timely manner."

17. Allied World has investigated the County's default of Burtis, its claim against the Performance Bond, and Burtis's allegations in response to the County's default declaration.

18. Allied World has determined that errors in the design of the Project by HVEA, and other acts and omissions of the County and HVEA, caused the Project to reach a stage that has prevented Burtis from progressing the work.

19. HVEA's design errors have rendered the Project impossible to complete as designed.

20. HVEA served the County both as the designer of the Project and as the Project's construction manager.

21. This dual role creates an inherent conflict of interest. A construction manager who also designed the Project will be predisposed to rejecting a contractor's allegation that there are errors in the design and to protecting itself from liability by laying blame for the costs and problems resulting from such errors at the feet of the contractor.

22. The Project includes the construction, through wetlands, of a multi-span bridge over railroad tracks and a yard operated by Metro North Railroad.

23. Certain heavy equipment is required to drill the shafts necessary to construct the bridge.

24. The County, as owner, had a duty to provide Burtis with all access necessary to construct the Project as designed.

25. HVEA failed to include in its design sufficient access through the wetlands to the bridge site for the required heavy equipment.

26. The drawings prepared by HVEA include a "permanent access road" through the wetlands.

27. According to the County, this "permanent access road" was intended only to provide maintenance and inspection access to the bridge piers in the future.

28. An HVEA letter dated May 29, 2015, describes this "permanent access road" as an "existing rubble and proposed stone fill causeway" that was not intended to be suitable to provide access "to accommodate any particular equipment or loading."

29. The only possible access to the bridge site through the wetlands that is reflected on HVEA's design, however, is this "permanent access road".

30. The "permanent access road" as designed by HVEA is not wide enough for the necessary heavy equipment to reach the bridge site.

31. The "permanent access road" as designed by HVEA cannot safely support the required heavy equipment.

32. Without access to the bridge site through the wetlands, the Project cannot be completed as designed.

33. The County and HVEA have taken the position that designing and constructing the temporary access through the wetlands necessary for the heavy equipment required to construct the bridge was Burtis's responsibility, as part of its "means and methods".

34. The County advised Allied World that a specification entitled "Furnishing Equipment for Installing Drilled Shafts" (Item 551.60) evidences Burtis's responsibility for designing and constructing temporary access through the wetlands.

35. This specification does not appear to contain any language or other indication that the obligation to provide or obtain access through the wetlands to the bridge site for the necessary heavy equipment was shifted to Burtis.

36. Moreover, since access would have to constructed through wetlands, appropriate permits would be required.

37. Obtaining the necessary permits was the responsibility of the County.

38. In the bid package for the Project, the County represented that it had obtained the permits required to construct the Project as designed by HVEA.

39. Nothing in the Contract shifts responsibility for permitting from the County to Burtis.

40. The permitting requirements referenced in the bid documents appear to include certain pre-construction notifications that were the responsibility of the County, as permittee, to prepare and provide to the permitting authorities.

CHIESA SHAHINIAN & GIANTOMASI PC ▪ 11 Times Square – 31st Floor ▪ New York, New York 10036 ▪ (212) 973-0572

41. Such pre-construction notifications include a restoration plan showing how temporary fill and structures would be removed and how the wetlands would be restored to pre-project conditions.

42. The Contract does not obligate Burtis to prepare such notifications or to design restoration plans.

43. An engineer retained by Burtis estimated that the cost of designing and constructing access through the wetlands to construct the Project as designed by HVEA would exceed $1.4 million.

44. Burtis contended that the lack of access is an error in HVEA's design, for which the County is responsible.

45. Any work that Burtis would be required to perform to create access would be a significant expansion of the scope of Burtis's obligations under the Contract, for which it would be entitled to additional compensation from the County.

46. At progress meeting 34, held on April 7, 2015, the County's project manager for the Project stated that Burtis's engineering and construction of an equipment access road would be covered under a change order to the Contract, pursuant to which Burtis would receive timely additional compensation.

47. At the next meeting (progress meeting 35, held on April 14, 2015), however, the County's Commissioner of the Department of Highways & Facilities overruled the County's project manager and stated that the equipment access road would be considered "disputed work", which Burtis would be required to perform, funding such work out of its own pocket and assuming the risks that the County would decline to compensate it therefor (in whole or in

CHIESA SHAHINIAN & GIANTOMASI PC ▪ 11 Times Square – 31st Floor ▪ New York, New York 10036 ▪ (212) 973-0572

part) and that, if the County ultimately agreed to pay for the work (in whole or in part), such payment would not be made for a significant amount of time.

48. Any contention that Burtis was responsible for the design and construction of access to the bridge site for the heavy equipment necessary to construct the bridge is contrary to New York law as to (a) a contractor's right to rely upon the adequacy of the design provided by the owner to the contractor and (b) the owner's obligation to provide access to the construction site to the contractor.

49. The County knew or should have known that, under New York law, the obligation to design, construct, and provide access through the wetlands to the bridge site was the County's and not Burtis's.

50. Upon information and belief, Burtis did not have the financial ability to fund, out of its own pocket, additional work at a cost that could approach or exceed 20% of the original Contract price, and assume the risk that the County would not pay therefor or that any payment therefor would not be made by the County for a significant amount of time.

51. Burtis did not have an obligation to, in effect, provide a loan to the County to fund extra work that the County's own project manager – the person who was in the best position to make such a determination on behalf of the County – believed and conceded to properly be work that should have been the subject of a change order and for which Burtis was entitled to timely additional compensation and that should not have been considered "disputed work" under the Contract.

52. Neither the bid package nor the Contract include or otherwise indicate that the obligation to provide access to the bridge site, through the wetlands, was shifted from the County, as Owner, to Burtis.

7

53. The County's own analysis of the bids it received for the Project indicates that none of the other eight bidders included the cost of designing and constructing access through the wetlands in their bid price, demonstrating that the other bidders believed the same as Burtis – that the County retained the obligation to provide access.

54. There was no reasonable legal or factual basis for the County's Commissioner of the Department of Highways & Facilities to overrule the County's project manager responsible specifically for the Project and conclude that design and construction of equipment access through wetlands to the bridge site fell within the scope of Burtis's obligations under the Contract.

55. There was no reasonable legal or factual basis for the County's Commissioner of the Department of Highways & Facilities to change the County's classification of such work from extra/change order work, as determined by the County's project manager, to "disputed work".

56. The County's decision to classify the work required to provide access through the wetlands for heavy equipment as "disputed work", when its own project manager identified the work as change order work, was a pretext designed to foist the funding for such work upon Burtis when it should have been borne by the County.

57. The County's decision to classify the work required to provide access through the wetlands for heavy equipment as "disputed work", when its own project manager identified the work as change order work, was a pretext designed to shift responsibility from the County's representative responsible for the design of the Project and who was responsible for the omission – HVEA – to Burtis.

CHIESA SHAHINIAN & GIANTOMASI PC ▪ 11 Times Square – 31st Floor ▪ New York, New York 10036 ▪ (212) 973-0572

58. In addition, the County apparently does not possess the permits necessary to construct the access necessary for the heavy equipment.

59. Whether the County can obtain the necessary permits is unclear.

60. In an attempt to resolve the dispute regarding the lack of equipment access to the bridge site, Burtis obtained (at its own cost) and submitted a proposal to the County pursuant to which the bridge would be constructed in a manner different from that designed by HVEA, using micro-piles.

61. Burtis suggested that the existing access road would be sufficient for the smaller equipment that would be used if the bridge was constructed using micro-piles, thereby avoiding the need for anyone to design and construct separate access through the wetlands sufficient for the heavy equipment necessary to construct the Project as designed, saving the County money and allowing work to proceed more expeditiously.

62. Upon information and belief, the County requested that HVEA analyze Burtis's proposal to use micro-piles to construct the bridge.

63. On November 12, 2015, HVEA set an e-mail to Burtis requesting a meeting to discuss the micro-piles proposal.

64. Upon information and belief, several hours later the County e-mailed its letter of default (dated November 10) to Burtis, which was the first notice Burtis received of the default declaration.

65. HVEA's design errors also required that work be stopped at a location known as the "west abutment".

66. Upon information and belief, work was stopped at the west abutment due to unstable soil conditions.

9

67. As designer of the Project, HVEA should have conducted soil borings to determine whether the ground was sufficiently stable for the required construction work to be performed.

68. Upon information and belief, HVEA failed to conduct adequate soil borings in the location of the west abutment.

69. As a consequence, HVEA was required to (and did) redesign the work to be performed at the west abutment.

70. Upon information and belief, Burtis submitted a proposed change order to the County in the sum of approximately $350,000 for the work required by HVEA's redesign at the west abutment.

71. Upon information and belief, HVEA recommended that the County reject Burtis's proposed change order because it considered the price to be too high.

72. Upon information and belief, to date, the County has neither accepted nor rejected Burtis's proposed change order for performance of the west abutment work necessitated by HVEA's redesign.

73. Burtis was ready, willing, and able to perform the west abutment work necessitated by HVEA's redesign upon approval of an appropriate change order.

74. Instead of proceeding to negotiate with Burtis an appropriate change order and price for the work necessitated by the HVEA redesign, the County and HVEA (on behalf of the County) suspended Burtis's work at the west abutment.

75. Upon information and belief, Burtis reasonably relied upon the accuracy and adequacy of the plans and specifications prepared by HVEA in bidding on the Project and entering into the Contract.

76. As a result of the errors in HVEA's design of the Project, the Project cannot be constructed as designed.

77. The County also interfered with Burtis's relationship with its subcontractors and suppliers, to Burtis's detriment.

78. Specifically, in or about January 2015, the County's project manager directed Burtis's bridge fabricator, Cameron Bridge, to proceed with manufacturing the bridge spans even though Burtis was not ready for the bridge to be fabricated.

79. The County did not have a contract with Cameron Bridge relative to the Project.

80. Upon information and belief, based upon the County's direction, Cameron Bridge manufactured the bridge spans at its location in Elmira, New York.

81. Upon information and belief, in or about February 2015, the County's project manager personally inspected Cameron Bridge's work at its location in Elmira and approved it for payment.

82. When Cameron Bridge completed its fabrication of the bridge spans, Burtis was not ready to receive and install the bridge.

83. As a result, the bridge spans have not been delivered to the Project site.

84. Cameron Bridge has sought payment for the bridge spans from Burtis and the County.

85. The County has refused to pay Burtis for the bridge spans.

86. Upon information and belief, the County represented to Burtis that it would pay Cameron Bridge either directly (out of the remaining contract balance under a procedure for payment of "Stored Materials") or by way of a joint check payable to Burtis and Cameron Bridge.

87. Upon information and belief, both Cameron Bridge and Burtis executed documents that the County requested to process payment to Cameron Bridge.

88. On or about April 29, 2015, Cameron Bridge filed a lien against the Project in the amount of $365,436.62 due to non-payment for the bridge spans.

89. By e-mail dated April 30, 2015, the County's project manager demanded that Burtis pay Cameron Bridge, despite the fact that the County (and not Burtis) directed Cameron Bridge to manufacture the bridge spans, represented that the County would pay (or arrange for payment of) Cameron Bridge, and yet failed and otherwise refused to pay Burtis (or Cameron Bridge) for the bridge spans as represented.

90. Upon information and belief, during a conference call among the County and counsel for Burtis, on or about July 1, 2015, the County again agreed to pay Cameron Bridge in the full sum of its lien, $365,436.32, through the "stored materials" payment procedure.

91. To date, the County has not issued payment to Cameron Bridge.

92. Upon information and belief, the County stopped processing Burtis's payment requisitions due to the lien filed by Cameron Bridge.

93. Upon information and belief, the County has failed to pay Burtis $156,098.55 for work that Burtis completed and that was accepted by HVEA, and for which Burtis submitted appropriate payment requisitions.

94. Like the design and construction of equipment access through the wetlands, the County sought to have Burtis fund an aspect of the construction project out of its own pocket – the cost of the bridge spans from Cameron Bridge – when the cost should have been borne by the County.

95. Under the pertinent portion of the Performance Bond, Allied World is obligated only if Burtis failed to "well and faithfully perform" the Contract.

96. The problems described above, which underlie the County's claim against the Performance Bond, are the result of actions, errors, and omissions of the County and its representative, HVEA, and not the result of a failure by Burtis to "well and faithfully perform" the Contract.

97. Any "failure to progress" the Project, as stated in the County's November 10 letter as the basis for the default declaration, is the result of errors, acts, and omissions of the County and its representative, HVEA.

98. The Contract is impossible to complete in accordance with HVEA's design.

99. Allied World is unable to conclude that the condition to its obligation under the Performance Bond has been satisfied.

100. Even if the condition to Allied World's obligation under the Performance Bond has been satisfied, Allied World is discharged from obligation under the doctrine of impossibility of performance.

101. An actual controversy exists among the parties as to Allied World's obligations under the Performance Bond (if any).

102. The amount in controversy exceeds $1.4 million.

103. Pursuant to 28 U.S.C. § 2201, Allied World requests judgment declaring that it is not obligated under the Performance Bond to complete the Contract or to indemnify the County for any amounts it pays to complete the Contract or otherwise to complete the Project, in whole or in part.

**WHEREFORE,** Allied World requests judgment declaring that it is not obligated under the Performance Bond to complete the Contract or to indemnify the County for any amounts it pays to complete the Contract or otherwise to complete the Project , in whole or in part, along with an award of costs, disbursements, and such other and further relief as the Court may deem just and proper.

Dated:  September 12, 2016

                **CHIESA SHAHINIAN & GIANTOMASI PC**
                Attorneys for Plaintiff
                *Allied World Specialty Insurance Company*

                By:   */s Adam P. Friedman*
                          Adam P. Friedman

                11 Times Square – 31st Floor
                New York, New York  10036
                (212) 973-0572